**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| ANTHONY NICHOLS, individually and on behalf of all others similarly situated,<br><br>    *Plaintiff*,<br><br>*v.*<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>    *Defendant.* | Case No. 14-cv-00962<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Anthony Nichols ("Plaintiff") brings this suit on behalf of himself and a class of similarly situated individuals against Defendant National Collegiate Athletic Association ("Defendant" or "NCAA") to obtain redress for all persons injured by Defendant's tortious and unlawful conduct. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE ACTION

1.  This case arises from Defendant's systemic failure to notify, educate and protect the student athletes under its supervision from the known dangers of concussion-related injuries. As the governing body of intercollegiate athletics, the NCAA controls and regulates virtually every aspect of game play in college sports, including those relating to player safety and health. However, despite having decades of knowledge regarding the debilitating dangers of concussions and concussion-related injuries, the NCAA breached its duty of care to its student wards by fraudulently concealing and/or negligently failing to educate players on the risks and signs of

concussion-related injuries and otherwise failing to implement effective protective measures. As a result, Plaintiff and members of the Class sustained severe physical injuries during their time as student-athletes and incurred actual damages in the form of medical expenses and continuing medical costs.

2.      This action seeks to hold the NCAA liable for the physical harm and monetary damages that Plaintiff and the Class have suffered, and continue to suffer, as a direct and proximate result of Defendant's unlawful conduct.

### PARTIES

3.      Plaintiff Anthony Nichols is a natural person and citizen of the State of California. Nichols played NCAA football for San Diego State University from 1989 to 1992, during which time he sustained repeated concussive trauma.

4.      Defendant NCAA is an unincorporated association with its principal office located in Indianapolis, Indiana. The NCAA acts as the governing body of college athletics and oversees twenty-three college sports and over 400,000 student athletes. More than 1,000 colleges and universities belong to the NCAA. On information and belief, the NCAA receives over $750 million in annual revenues from college athletic programs.

### JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative class, which consists of at least 100 members, is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of CAFA's exceptions apply to this action. This Court has personal jurisdiction over Defendant because Defendant conducts significant business in this District.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant

conducts significant business in this District such that it is subject to the Court's personal

jurisdiction and thus can be deemed to reside here.  Additionally, the NCAA concussion

litigation has been centralized by the Judicial Panel on Multidistrict Litigation in front of Judge

Lee of this District, Case No. 13-cv-9116, MDL No. 2492.

<h3 style="text-align:center">FACTS COMMON TO ALL COUNTS</h3>

**The NCAA and its Stated Mission to Protect Student Athletes**

7.      Formerly known as the Intercollegiate Athletic Association of the United States,

the NCAA was formed in 1906 "to protect young people from the dangerous and exploitive

athletic practices of the time."[1] This core purpose is emphasized on the NCAA website, which

states that:

> Part of the NCAA's core mission is to provide student-athletes with a competitive
> environment that is safe and ensures fair play. While each school is responsible
> for the welfare of its student-athletes, the NCAA provides leadership by
> establishing safety guidelines, playing rules, equipment standards, drug testing
> procedures and research into the cause of injuries to assist decision making. By
> taking proactive steps to student-athletes' health and safety, we can help them
> enjoy a vibrant and fulfilling career.[2]

8.      The NCAA's commitment to safeguarding its student-athletes is further addressed

throughout the NCAA Constitution. Article 2.2 of the Constitution describes "The Principle of

Student-Athlete Well-Being," and prescribes that "Intercollegiate athletics programs shall be

conducted in a manner designed to protect and enhance the physical and educational well-being

---

[1] "Health And Safety" page on the official NCAA website. Located at: http://www.ncaa.org/
health-and-safety (last accessed Feb. 11, 2014).
[2] Health and Safety page on the NCAA website. Located at: http://www.ncaastudent.org/wps/
wcm/connect/public/NCAA/SSI/Resources/ (last accessed Feb. 11, 2014.)
health-and-safety (last accessed Feb. 11, 2014).
[2] Health and Safety page on the NCAA website. Located at: http://www.ncaastudent.org/wps/
wcm/connect/public/NCAA/SSI/Resources/ (last accessed Feb. 11, 2014.)

of student-athletes."

9.     To accomplish its purpose of safeguarding student-athletes, the NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. Containing over 900 pages, these documents provide detailed instruction on matters ranging from game and practice rules to player eligibility and scholarships, as well as matters relating to player well-being and safety. NCAA member institutions are required to firmly abide by such NCAA guidelines.

10.     Additionally, the NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidance, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."

11.     Accordingly, the NCAA holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which student-athletes and member institutions can rely upon for guidance on player-safety issues. As such, the NCAA has expressly and implicitly assumed a duty of care to the student-athletes its promised to protect.

**The Long Term Effect of Concussive Head Injuries**

12.     Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science has long recognized the debilitating effects of concussions[3] and other traumatic brain injuries, finding that repeated impact to the head can cause permanent brain damage and

---

[3] The American Association of Neurological Surgeons defines concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."

4

increased risk of long-term cognitive decline and disability.

13.     Contemporary studies have confirmed the long-term physical and psychological effects of concussions, linking repeated concussive trauma with an increased risk of depression, dementia, suicide, as well as the development of chronic traumatic encephalopathy ("CTE"), a degenerative brain disease marked by the appearance of red protein deposits on the brain. Symptoms of CTE can take years, or even decades, to appear.

14.      Concussions are considered to be fairly commonplace in high-contact sports such as football, boxing, soccer, and hockey. However, the general public (including most athletes) are largely unaware of the signs and symptoms of a concussion, as well as how to properly respond.

**Recognizing and Treating Concussions**

15.     The symptoms of concussion include: feeling dazed or lightheaded, memory loss, nausea, headaches, blurred vision, difficulty speaking or concentrating, difficulty with coordination or balance, anxiety, and fatigue.

16.     Additionally, concussions are graded according to various levels of severity. Grade 1 concussions involve symptoms of concussion lasting less than fifteen minutes and with no loss of consciousness. Grade 2 concussions involve cases with symptoms lasting longer than fifteen minutes but with no loss of consciousness. Finally, Grade 3 concussions encompass situations where a person sustains any loss of consciousness, no matter how brief.

17.     With a Grade 1 concussion, players are able to resume play once symptoms subside. A Grade 2 concussion, however, requires the player to discontinue play for a week. Those sustaining Grade 3 concussions are advised to immediately seek medical treatment.

18.     Athletes who prematurely return to play are at risk of Second-Impact Syndrome

("SIS"), which occurs when one sustains a second head trauma before recovering from the first concussion. SIS can cause rapid swelling of the brain, sometimes resulting in death.

**The Medical Consensus on Treatment of Concussions in Athletes**

19.     After decades of medical studies highlighting the dangers of concussive head injuries, as well as sobering statistics regarding the prevalence of severe disability or death caused by sports-related concussion, the international medical and sports communities began to reach a general consensus on the long-term neurodegenerative effects of repetitive head trauma and the need for improved player safety procedures in the 1990s-2000s.

20.     By 1991, Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society each developed return-to-play criteria for football players suspected of having sustained head traumas.

21.     In November 2001, medical experts convened in Vienna for the 1st International Symposium on Concussion in Sport. Following the symposium, the group issued a consensus statement with recommended return to play guidelines. The guidelines affirmatively stated that players who exhibit any symptoms or signs of a concussion should not be allowed to return to play, should be closely monitored for deterioration, medically evaluated after the injury, and follow a medically supervised stepwise process in order to return to playing the sport. In addition, the statement included a recommended stepwise process which called for a gradual and monitored increase in physical activity before a player could resume the sport.

22.     Later, in 2004, a convention of neurological experts met with the express goal of providing health and safety recommendations for athletes in danger of suffering concussive injuries. The experts likewise recommended that players never be returned to play while symptomatic.

6

23.     Similarly, in 2004, the National Athletics Trainers Association ("NATA") published concussion management guidelines that again emphasized the need for return to play protections and symptom monitoring recommended by other panels.

24.     In November 2004, the 2nd International Symposium on Concussion in Sport was held in Prague. At the symposium, experts continued to promote the return to play guidelines previously set forth in Vienna, and additionally recognized the distinction between simple (those resolving over 7-10 days) and complex (those with persistent and prolonged symptoms) concussions. The panel found the occurrence of complex concussions in athletes suffering repeated concussions, stating that such athletes may require neuropsychological testing and specialized monitoring between simple return to play guidelines.

25.     In 2008, the 3rd International Symposium on Concussion in Sport was held in Zurich, wherein experts again reaffirmed the need for a graduated stepwise return to play process following a concussion, this time also recommending a 24-hour wait period between each step.

26.      In addition to the above expert recommendations, studies conducted over the past twenty years by entities such as the University of Virginia, the National Center for Catastrophic Sport Injury Research, the University of North Carolina's Center for the Study of Retired Athletes, and published in the Archives of Clinical Neuropsychology, the New England Journal of Medicine, and the Journal of Athletic Training continued to confirm the harmful and long-term neurological effects of concussive injuries sustained by athletes.

27.     The NCAA was aware of the mounting literature and medical advice regarding the latent effects of traumatic head injuries and the need for safe return to play guidelines. In fact, information collected by the NCAA's own injury surveillance data confirmed that high rates of concussions and head injuries, with concussions accounting for 7% of all football practice and

game injuries and between 7% and 14% of all hockey injuries in the 2005-2006 season.

28.     Additionally, in 2003, two separate studies partially funded by the NCAA concluded the following: (1) that athletes required a full seven days to regain their pre-concussion abilities after sustaining a concussion; and (2) that NCAA football players with a history of concussions were at an increased risk of sustaining additional future concussions, and thus, should receive more information about this risk before deciding whether to continue playing football. One of the studies further recommended the use of standardized assessment tools to guide medical staff in evaluating and treating student athletes.

**The NCAA Ignores Mounting Medical Evidence and Refuses to Implement Any of the Recommended Guidelines.**

29.     Despite having knowledge of the foregoing research studies and expert recommendations, the NCAA continued to allow players to play on the days immediately following their receipt of a concussion, failed to implement any guidelines or rules to prevent repeated concussions or educate players about their increased risk, and refused to endorse any of the recommended return to play procedures. The NCAA further failed to take any action to educate its student athletes on the risks of repeated head traumas.

30.     In particular, the NCAA refused to endorse or adopt any of the internationally accepted guidelines promulgated by the Vienna, Prague, or Zurich symposiums. Rather, in the Sports Medicine Handbooks published between 2003-2010, the NCAA rejected the international recommendations and continued to promote individualized return to play decisions, stating that although "more recent grading systems have been published . . . it is important to remember that many of these injuries are best treated in an individual fashion." Guideline 2i of the 2004-2010 Handbooks.

31.     It was not until April 2010—a full nine years after international return to play

recommendations were issued in Vienna and only after the NFL implemented a new concussion policy—that the NCAA made any changes to its concussion treatment protocols, this time passing legislation that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

32.     Under the NCAA's new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions." Guideline 2i in 2010-2011 Handbook. The policy further stated that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and that medical clearance would be determined by the team physician. Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses...including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

33.     Notably, the policy fails to recognize any of the internationally recognized return to play or recommended stepwise procedures. Instead, the NCAA passes the responsibility for developing prevention and management procedures on to its member schools, and places the burden of actively seeking medical attention on its student-athletes.

## FACTS SPECIFIC TO PLAINTIFF

**Plaintiff Anthony Nichols**

34.     Plaintiff Anthony Nichols attended San Diego State University, where he played on the school's NCAA football team from 1989 to 1992.

35.     Nichols suffered several concussions while playing college football.

36.     As a direct result of the traumatic head injuries he incurred while playing NCAA football, Nichols has had to undergo neurological testing, including having a CAT scan and several MRIs taken.

37.     After his doctor noticed brain calcifications in his MRI results—indicating possible brain tumors—Nichols was referred to a neurologist and put on a schedule of annual MRIs.

38.     The neurologist explained that Nichols' brain calcifications may have been caused by the brain trauma he sustained during his time playing football, and informed him that he needed to be alert to any signs of headaches or pressure, as those could indicate that the calcifications had developed into tumors.

39.     As a result of the concussive head injuries he suffered while playing college football, Nichols has and continues to incur significant medical bills and expenses.

40.     In addition to the treatment and monitoring of his brain calcifications, Nichols is at an increased risk of developing latent brain injuries or future neurodegenerative disorders.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of himself and a Class defined as follows:

> All current and former NCAA student-athletes who sustained a concussion(s) or suffered concussion-like symptoms while playing an NCAA-regulated sport and who incurred medical expenses as a result.

> The following persons are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors or assigns of any such excluded persons.

42.     **Numerosity:** The exact number of the members of the Class is unknown and not

available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, thousands of student-athletes fall into the definition of the putative class. Members of the Class can be identified by the records kept at NCAA affiliated colleges and universities.

43.     **Commonality:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to the following:

(a)     Whether Defendant had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

(b)     Whether Defendant had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related traumatic brain injuries;

(c)     Whether Defendant's conduct as alleged herein constitutes negligence and breach of duty;

(d)     Whether Defendant's conduct as alleged herein constitutes negligence;

(e)     Whether Defendant's conduct as alleged herein constitutes breach of contract;

(f)     Whether Defendant's conduct as alleged herein constitutes fraudulent concealment;

(g)     Whether Defendant was unjustly enriched at the expense of Plaintiff and the Class; and

(h)     Whether Plaintiff and the Class are entitled to equitable relief, including but not limited to, actual and compensatory damages, medical monitoring, and other injunctive

relief.

44.     **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class, as Plaintiff and other members sustained damages arising out of the wrongful conduct of Defendant based upon the same negligent conduct

45.     **Adequate Representation:** Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

46.     **Predominance and Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Class are relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. It would be virtually impossible for the members of the Class to obtain effective relief from Defendant's misconduct on an individual basis. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## COUNT I
## NEGLIGENCE
### (Individually and on Behalf of the Class)

47.     Plaintiff incorporates by reference the foregoing allegations.

48.     As evident by its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of its student-athletes.

49.     Defendant likewise assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations.

50.     Defendant's duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to players. Defendant further had a duty to educate its member institutions and student athletes on the proper ways to evaluate and treat traumatic head injuries and the increased risks associated with repeated concussions, and a duty not to conceal material information. Defendant's duty further included a duty to warn student athletes of the dangers of concussions and of the risks associated with their respective sports.

51.     As detailed in the general counts above, Defendant breached its duty by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the treatment and evaluation of traumatic head injuries, including those involving return to play regulations. Defendant further breached its duty to Plaintiff and the Class by fraudulently concealing and/or failing to disclose material information it possessed regarding the long-term risks and effects of repeated head traumas, failing to warn students of the dangers of concussions and of the risks associated with their respective sports, and otherwise failing to educate its member institutions and student athletes on the proper ways to evaluate and treat traumatic head injuries and the

increased risks associated with repeated concussions.

52.     Defendant knew or should have known that its current concussion guidelines were outdated and contrary to internationally accepted medical standards, and knew or should have known that Plaintiff and the Class would rely upon its outdated guidelines for guidance and instruction.

53.     Defendant had superior knowledge of material information regarding the effect of repeated traumatic head injuries, as such information was not readily available to Plaintiff or Class Members, and knew or should have known that Plaintiff and the Class would act and rely upon the mistaken beliefs created by its concealment.

54.     Defendant's negligent conduct caused Plaintiff and the Class to act without taking reasonable steps to prevent or mitigate any injuries, latent or otherwise, that they suffered as a result of their traumatic head injuries.

55.     Plaintiff and members of the Class reasonably and justifiably relied upon the negligent conduct of the NCAA to their detriment.

56.     As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have incurred damages in the form of past and future medical expenses and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendant's negligence.

57.     Plaintiff is entitled to and seek all recoverable damages resulting from Defendant's negligent conduct to be proven at trial, as well as appropriate injunctive relief and Court-supervised medical monitoring.

## COUNT II
**BREACH OF EXPRESS CONTRACT**
**(Individually and on Behalf of the Class)**

58.    Plaintiff incorporates by reference the foregoing allegations.

59.    As student-athletes at institutions governed by the NCAA, Plaintiff was required

to, and did, enter into a contract with the NCAA as a prerequisite to sports participation. The

contracts required Plaintiff to complete a form affirming that he has read the NCAA regulations

and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution,

Operating Bylaws, and Administrative Bylaws, and further, that he agreed to abide by NCAA

Division bylaws.

60.    In exchange for Plaintiff's agreement, the NCAA promised to perform certain

services and functions, including, inter alia:

    (a)    conducting intercollegiate athletics "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2;

    (b)    requiring that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3; and

    (c)    requiring that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience." NCAA Const., Art. 2, § 2.2.

61.    By signing and agreeing to abide by NCAA regulations, and thereafter

participating in NCAA sanctioned sports programs in accordance with such regulations, Plaintiff

and the Class fulfilled their obligations under the contract.

62.    As described in the foregoing allegations, the NCAA breached the Parties'

agreement by failing to ensure that its student-athletes were provided with a safe environment in

which to participate in their NCAA sport activities. The NCAA further breached the contract by

concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

63.     Defendant's breach of its contracts with Plaintiff and the Class caused Plaintiff and the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses.

64.     Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendant's breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(Individually and on Behalf of the Class)**

65.     Plaintiff incorporates by reference the foregoing allegations.

66.     To the extent that an express written contract cannot be established between Plaintiff and the Class and Defendant, the facts set forth above support the finding of an implied contract.

67.     Under the implied contract, student-athletes agreed to be bound by NCAA rules and regulations in exchange for their participation in NCAA controlled athletic programs. As a condition of the implied contract, the NCAA agreed to abide by the promises set forth in its own Constitution and Bylaws, as described above.

68.     Plaintiff and the Class indicated their acceptance of the contract, and further, fully performed under the contract, by participating in NCAA controlled athletic programs in accordance with NCAA rules and regulations.

69.     Defendant breached the contract by failing to ensure that its student-athletes were provided with a safe environment in which to participate in their NCAA sports activities.

Defendant further breached the contract by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

70.     Defendant's breach of its contracts with Plaintiff and the Class caused Plaintiff and the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendant's breach.

71.     Plaintiff, individually and on behalf of the Class, seeks damages for Defendant's breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT IV
### BREACH OF EXPRESS CONTRACT
### (On Behalf of the Class as Third-Party Beneficiaries)

72.     Plaintiff incorporates by reference the foregoing allegations.

73.     To the extent that no express or implied contract is found to exist between Plaintiff and the NCAA, an express contract existed between the NCAA and its member institutions. Under the terms of their express contracts with the NCAA, member institutions agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

74.     Plaintiff and the Class are the intended third-party beneficiaries of the contract between the NCAA and its member institutions. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA organization.

75.     Under the terms of their contract, as set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, member institutions agreed to, among other things: (1) "conduct[] [intercollegiate athletic programs] in a manner designed to protect and enhance the physical and educational well-being of student athletes"; and (2) "protect the health of and provide a safe environment for each of its participating student-athletes."

76.     Defendant and its member institutions breached their contract by: (1) failing to implement or require rules of play and return to play criteria to minimize or prevent the risk of concussions and concussion-related injuries; and (2) failing to adequately inform and educate its student-athletes on the symptoms and long-term dangers of concussions and concussion-related injuries.

77.     As a direct result of these breaches, Plaintiff and the Class suffered physical injury and damages in the form of past, ongoing, and future medical expenses, and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendant's conduct.

78.     Plaintiff, individually and on behalf of the Class, seeks damages for Defendant's breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT V**
**FRAUDULENT CONCEALMENT**
**(Individually and on Behalf of the Class)**

79.     Plaintiff incorporates by reference the foregoing allegations.

80.     As described in the general allegations above, the NCAA has long been aware of the dangers and risks surrounding concussions and concussion-related injury. For instance, based on studies which it partially funded, as well as other studies recognized in the medical

community, the NCAA knew that multiple head traumas were associated with greater risk of neurodegenerative conditions, such as CTE and Alzheimer's disease, and other cognitive decline.

81.     However, rather than inform Plaintiff and the Class about these dangers, the NCAA took active steps to conceal this knowledge from its student-athletes. The NCAA refused to publicly acknowledge the findings of those studies, and likewise refused to update its Handbooks to reflect its current understanding of the risks and dangers associated with concussions.

82.     By concealing this information, the NCAA intended to induce a false belief in its student-athletes regarding the safety and propriety of returning to play their respective sports after sustaining one or more concussions. Under these circumstances, the NCAA had a duty to speak.

83.     Plaintiff and the Class could not have reasonably discovered the truth, as they were under the supervision and regulation of Defendant and its member institutions.

84.     The information concealed by Defendant was material in that Plaintiff would have acted differently had he been aware of the concealed information. For instance, had he been aware of the long-term risks related to recurring head injuries, Plaintiff would not have continued to play his respective NCAA sports and/or would have taken additional time to recover from his injuries before resuming play.

85.     Plaintiff and the Class justifiably relied upon Defendant's silence and failure to speak by continuing to play in their respective NCAA sports after sustaining concussions and other concussion-related trauma, suffering direct injury as a result.

86.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered the harm described above and will continue to suffer damages and injuries in the

future which have yet to be fully manifested.

**COUNT VI**
**UNJUST ENRICHMENT**
**(*in the alternative to breach of contract*)**
**(Individually and on Behalf of the Class)**

87.     Plaintiff incorporates by reference the foregoing allegations, excluding the

allegations that an enforceable contract existed between the NCAA and the Class.

88.     Both the NCAA and its institutional members receive significant revenues from

the collegiate sports played by its student-athletes. These revenues include, but are not limited to,

contractual revenues from broadcasting agreements that amount to hundreds of millions of

dollars a year, if not more.

89.     The NCAA appreciates or has knowledge of such benefits.

90.     Under principles of equity and good conscience, Defendant should not be

permitted to retain the profits it receives at the expense of Plaintiff and the Class while refusing

to pay for medical expenses incurred as a result of its unlawful actions.

91.     Plaintiff, individually and on behalf of the Class, seeks restitution and/or

disgorgement of all monies Defendant has unjustly received as a result of its conduct alleged

herein.

**COUNT VII**
**MEDICAL MONITORING**
**(Individually and on Behalf of the Class)**

92.     Plaintiff incorporates by reference the foregoing allegations.

93.     During their tenure as NCAA athletes, Plaintiff and the Class suffered traumatic

head injuries, including sub-concussive trauma and concussions. These traumatic injuries,

especially when repeated, significantly increase the risk of later developing neurodegenerative

disorders and diseases, including but not limited to: CTE, MCI, Alzheimer's disease, and other

20

similar cognitive-impairing conditions.

94.     The concussive trauma suffered by Plaintiff and the Class also cause latent injuries that can develop over time and manifest later in life. These injuries include but are not limited to: varying levels of neuro-cognitive disability and decline, mood and personality changes, and development of encephalopathy.

95.     Despite being aware of the dangers of exposing student-athletes to repetitive head trauma without adequate treatment or protection, the NCAA concealed information regarding these risks from Plaintiff and the Class and otherwise failed to educate or inform Plaintiff and the Class on the symptoms and long-term dangers of traumatic head injuries. The NCAA further failed to timely implement regulations and requirements, such as enhanced return to play guidelines or proper baseline testing and diagnostics, to minimize or mitigate the effects of such injuries.

96.     Accordingly, as a result of the NCAA's unlawful conduct, Plaintiff and the Class are at an increased risk of developing the neurodegenerative conditions described in Paragraph 99. Further, treatment and identification of Plaintiff and Class members' latent brain injuries require specialized testing not generally given to the public at large.

97.     Certain medical monitoring procedures exist that make possible the early detection of the neurodegenerative conditions that Plaintiff and Class are at increased risk of developing. These monitoring procedures include, but are not limited to: (1) baseline testing and diagnostic exams to identify and diagnose existing or developing adverse health effects and injuries and (2) behavioral and pharmaceutical programs to prevent, treat, or mitigate the adverse effects of existing and/or developing injuries. These procedures are specific to individuals exposed to repetitive head injuries and differ from those generally recommended in the absence

of increased risk.

98.     As set forth above, such monitoring procedures are necessary to enable Plaintiff

and members of the Class to obtain early detection, diagnosis, and treatment of the

neurodegenerative and cognitive conditions to which they are at an increased risk of developing,

and will reduce or alleviate the long-term effects of such conditions.

99.     Plaintiff and the Class therefore seek an injunction requiring Defendant to fund a

Court-supervised, comprehensive medical monitoring program for Plaintiff and the Class with

the purpose of facilitating the early detection and diagnosis of neurodegenerative disorders

caused by traumatic head injuries.

100.    Under such a monitoring program, the NCAA should be required to establish a

trust fund to pay for the medical monitoring and treatment of Plaintiff and the Class as frequently

and appropriately as necessary.

101.    Plaintiff and the Class have no other adequate remedy at law, as monetary

damages alone cannot compensate them for the continued and long-term risk of developing

neurodegenerative conditions and other manifested latent injuries resulting from their concussive

injuries, and the physical and economic losses associated with such harm. Without the Court-

supervised and approved medical monitoring program described herein, Plaintiff and the Class

will continue to face an unreasonable risk of continued injury and disability.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Anthony Nichols, individually and on behalf of the Class,

requests that the Court enter an Order providing for the following relief:

A.      Certify this case as a class action on behalf of the Class defined above, appoint

        Plaintiff as Class Representative, and appoint his counsel as Class Counsel;

B.     Declare that Defendant's actions, as set out above, constitute negligence, breach of express contract, breach of implied contract, fraudulent concealment, and unjust enrichment;

C.     Grant an injunction for the requested medical monitoring relief;

D.     Award all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendant's misconduct;

E.     Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

F.     Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

G.     Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

H.     Award such other and further relief as equity and justice may require.

**JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

Dated: February 11, 2014          **ANTHONY NICHOLS**, individually and on behalf of all others similarly situated,

By: /s/ Jay Edelson
One of his Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
Mark S. Eisen
meisen@edelson.com
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Robert A. Clifford
rclifford@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
Tel: 312.899.9090
Fax: 312.251.1160

Brian W. Coffman
bcoffmanlaw@gmail.com
COFFMAN LAW OFFICES
2615 North Sheffield Avenue
Chicago, Illinois 60614
Tel: 773.348.1295
Fax: 773.248.6013

Richard R. Gordon
richard.gordon@gordonlawchicago.com
GORDON LAW OFFICES, LTD.
211 West Wacker Drive, Suite 500
Chicago, Illinois 60606
Tel: 312.332.5200
Fax: 312.236.7727

Steven K. Mamat
STEVEN MAMAT, PLLC
302 S. Main St., Suite 202
Royal Oak, Michigan 48067
Tel: 248.548.1009
Fax: 248.548.1012

Samuel M. Lasser
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero St.
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047